IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Equal Employment Opportunity Commission, | Case No. 3:16 CV 2406 |
| Plaintiff, | MEMORANDUM OPINION AND ORDER |
| -vs- | JUDGE JACK ZOUHARY |
| Mathews Ford Marion, et al., | |
| Defendants. | |

**INTRODUCTION**

Plaintiff Equal Employment Opportunity Commission (EEOC) brings this action on behalf of Charging Party Michael Stillwell (Doc. 1). EEOC claims Defendants Mathews Ford Marion, Inc. (Mathews Ford) and Mathews Auto Group violated the American with Disabilities Act (ADA) by failing to reasonably accommodate Stillwell's disability and eventually terminating him because of his disability. Defendants argue Mathews Auto Group is not a proper party to this action because it is neither a legal entity nor an employer. Further, they contend that Mathews Ford did not violate the ADA because Stillwell was provided every accommodation he requested during his employment, and he was terminated because of dishonesty and poor work, not his disability. A bench trial was held (Trial Transcript Vol. I, Doc. 91; Trial Transcript Vol. II, Doc. 92), followed by briefing (Docs. 95–96).

**FINDINGS OF FACT**

**Background**

Stillwell has been deaf since age three (Doc. 91 at 7). In August 2004, he was hired as a body technician at Mathews Ford. Prior to joining Mathews Ford, he worked as a technician for twenty-six years at various body shops. Mathews Ford hired Stillwell because of this experience. As a body technician, Stillwell's primary job function was to perform body work on damaged vehicles. Stillwell worked at Mathews Ford until he was terminated on April 16, 2012.

During those eight years, Stillwell was paid by Mathews Ford (Tr. Exs. 38, 42–46), and his pay rate was determined by Mathews Ford personnel (Doc. 91 at 95–96). He was also disciplined only by Mathews Ford personnel (*id.* at 94–95). He never called into or reported to anyone at another Mathews dealership (*id.* at 94–96).

Stillwell reported to the body shop manager, who reported to Spencer Mathews (the general manager) and Thurman Mathews (then-owner). Before Thurman's passing, Spencer reported to Thurman (Doc. 92 at 88–89). Stillwell reported to three body shop managers of significance: Tim Larkin (when he was first hired), Greg Biggerman (2006 through 2012), and Michael Holmes (March 2012 to April 2012) (Doc. 91 at 24, 69–70).

**Hiring**

Mathews Ford knew Stillwell was deaf when he was hired. Stillwell applied for a position by dropping off a resume with Larkin (*id.* at 18). Stillwell listed the Ohio Relay Services (ORS) number at the bottom of the resume, and he "explained to [Larkin] how to . . . utilize the relay service" (*id.*). Larkin utilized the ORS to inform Stillwell that Mathews Ford was "looking to hire [him]" and to set a time to meet (*id.* at 18–20). Stillwell communicated with Larkin without an interpreter during both their initial meeting and the meeting following their phone call (*id.* at 20–23, 96).

**Communication throughout Employment**

Stillwell communicated with other employees and his supervisors at Mathews Ford using written notes, hand gestures, and reading lips. Stillwell also taught Larkin and Biggerman some "very basic" sign language (*id.* at 29, 42–43; *see also* Doc. 80 at 107–10).

At trial, Stillwell testified that his "English is not good" (Doc. 91 at 75), that he is "just not very good at reading English" (*id.* at 92), and that "[he] can read the estimates, that's it" (*id.* at 89). But he also discussed several conversations he had with his supervisors in writing and admitted that he "mostly wrote" notes or "show[ed] [his supervisor] something in writing" if he had questions (*id.* at 33, 40). He also reported in his Social Security Disability Application that he can read and write English (Doc. 92 at 126; *see also* Tr. Ex. 128).

Stillwell never told anyone at Mathews Ford that he could not read English, or that he did not understand something written in English (Doc. 91 at 89, 102–03). Nor did he disclose that he could read English, but not so well (Doc. 92 at 127). When Holmes started at Mathews Ford, he "assumed [Stillwell] could read" because Holmes "could hand him a repair estimate and he knew what car to pull in" and "what to do to it" (Doc. 90 at 90). Although Stillwell's ability to read English appears somewhat limited, this Court finds it is not as limited as Stillwell suggested at trial.

Stillwell also denied he can read lips (Doc. 91 at 7). But this Court observed him correct the interpreters several times when they were speaking but not signing (*see id.* at 86). When asked how he was able to do this if he cannot read lips, Stillwell appeared flustered and was evasive. He continued to deny any ability to read lips (*id.*). At one point, he conceded he can understand some words, but not "a whole sentence" (*id.* at 87; *see also* Doc. 73-1 at 34). But when pressed, Stillwell returned to a blanket denial: "I can't -- I can't read -- I can't read lips. I can't read lips" (Doc. 91 at

3

87). Faced with this conflicting testimony, and based on its own observations, this Court finds Stillwell's ability to read lips is also more extensive than he acknowledged at trial.

And although Stillwell testified that he has no residual hearing (*id.* at 7), it came to light that he "often use[s]" a hearing aid (*id.* at 87). He did not wear it during trial because he is "not comfortable with it," "[i]t makes noise," and "[i]t bothers [him]" (*id.* at 88). Stillwell did not explain why he often uses a hearing aid if he does not have any residual hearing.

These findings relate not only to Stillwell's ability to communicate and Mathews Ford reasonable understanding of that ability, but also to Stillwell's credibility. This Court finds Stillwell less than fully credible as a witness.

**Accommodation Requests before April 16, 2012**

Before April 16, 2012, Stillwell requested an interpreter on two occasion while at Mathews Ford: once for framework training while Larkin was body shop manager and once for a staff "pizza" meeting while Biggerman was body shop manager (*id.* at 34–37, 43–46, 96–97). Brian Shelton, the EEOC investigator involved in this case, confirmed that Stillwell reported requesting an interpreter "two times and two times only" (Doc. 92 at 70–71; *see also* Tr. Ex. 155). An interpreter was provided on both occasions (Doc. 91 at 37, 46; Doc. 92. at 71).

Stillwell alleged he made another request for an interpreter after a staff meeting concerning insurance. He claimed that after this meeting, he asked Biggerman to "[p]lease, next time get an interpreter" (Doc. 91 at 50–51). But when pressed about the timeline of events, Stillwell recanted: "I'm actually remembering -- I'm sorry, but I'm thinking I'm remembering it was a different company altogether. I don't know" (*id.* at 100–01). This Court finds that before April 16, 2012, Stillwell requested an interpreter on only two occasions while at Mathews Ford, and he never made a request that was denied.

Stillwell never requested, and did not need, an interpreter to assist him in repairing vehicles (*id.* at 88–89, 111–12; *see also* Doc. 87 at 2). Nor did Stillwell ask for an interpreter during his disciplinary meeting with Biggerman for failing to properly repair a PT Cruiser, discussed further below (Doc. 92 at 27; *see also* Tr. Ex. 155). He did not request an interpreter during this meeting because "he read and understood the write-up," and he explained his side of the story through a written note (*see* Doc. 92 at 29, 76–77; Tr. Ex. 155).

Stillwell did request a space to install a Video Relay Service (VRS), which Mathews Ford provided (Doc. 91 at 97).

**Accommodation Request at the Termination Meeting**

On April 16, 2012, Stillwell met with Holmes and James Woosten (supervisor of the service department). At the beginning of the meeting, Holmes "placed a paper in front of" Stillwell, along with a picture of a Ford F-150 that Stillwell had previously worked on (*id.* at 71–73). Stillwell read the paper and noticed that the box next to "fired" was marked (*id.* at 73; Doc. 92 at 34; *see also* Tr. Ex. 119). He understood he was being terminated for his work on the Ford F-150 (Doc. 92 at 34).

Stillwell then "asked Mr. Holmes for paper" and wrote "I am innocent" (Doc. 91 at 73; *see also* Doc. 90 at 138). Stillwell also wrote "I need an interpreter" (Doc. 91 at 73). He wanted an interpreter so he could "explain what happened, or anything that was missed" (*id.* at 74). He felt he could not write everything he wanted to say (*id.* at 74–75).

Holmes responded "that Thurman wanted [him] to leave" (*id.* at 75). Stillwell "wrote back . . . that [he] wanted to get [his] home number and the interpreter's number" (*id.*). Stillwell then gave Holmes the numbers, "locked up [his] tools[,] and that was it" (*id.*). The next day, Holmes called Stillwell and left a SignMessage that he spoke with "Mr. Mathews" and that Mr. Mathews is "refusing to request an interpreter" and that "he's not going to change his mind" (*see* Tr. Ex. 1). In response,

Stillwell "typed up information regarding the ADA" and faxed it to Holmes (Doc. 91 at 81; *see also* Tr. Ex. 20). He then called Holmes "to make sure that he did receive the fax," and Holmes confirmed that he did (Doc. 91 at 81). Stillwell did not attempt to discuss his version of events with Holmes in the fax or during the follow-up phone call with Holmes (Doc. 92 at 19–21).

Spencer, Holmes' supervisor at the time, testified that Holmes did not have the authority to negotiate with Stillwell at the termination meeting, and that the termination decision was final (*id.* at 127). Spencer is not aware of any time when Mathews Ford changed its mind after deciding to fire an employee (*id.*). He stated that an explanation from Stillwell would not have changed the decision (*id.* at 127–28, 133–35). And when asked what harm providing an interpreter at or after the termination meeting would have caused, Spencer responded that Stillwell "had already been fired, and we weren't going to change our mind" -- "[t]here was no need to do something that we didn't need to do. We had moved on" (*id.* at 135).

**General Disciplinary Procedures at Mathews Ford**

Mathews Ford does not have any formal employee code of conduct or written disciplinary policies. Because it is a small dealership, issues are handled on a "case-by-case basis" (*id.* at 90). How an incident is addressed, and the extent of any disciplinary measures, depends on several factors including "the deficiency of the repair job," the technician's work history, and how the issue is discovered (*see* Doc. 90 at 42–47). During Stillwell's employment, body shop managers made day-to-day decisions, but more significant actions such as hiring and firing had to be reviewed with Thurman and Spencer (*see* Doc. 80 at 70–76; Doc. 90 at 21, 27–28; Doc. 92 at 104–06). Holmes did not believe he had discretion over hiring and firing decisions (Doc. 90 at 21, 27), and Biggerman never fired an employee without discussing it with Thurman (*see* Doc. 80 at 72–73, 75–76).

6

Mathews Ford normally discusses issues with employees before taking disciplinary action (Doc. 92 at 106), and generally does not go straight to a written warning or termination (Doc. 90 at 44; *see also* Doc. 80 at 76–77). Body shop managers usually listen if a technician has an explanation for why things turned out the way that they did (Doc. 80 at 76–77; Doc. 90 at 44–46). But if an issue continues, there is "a good chance" the employee "could be terminated" (Doc. 90 at 43–44; *see also* Doc. 80 at 78–79).

**PT Cruiser Incident**

In February 2011, Stillwell was disciplined for failing to properly repair a PT Cruiser. He originally "overlooked" that the estimate required repairs to the rear body panel (Doc. 91 at 54–57). He eventually realized his mistake, but he was "very busy" and "tried to hurry" (*id.*). Instead of repairing the part, Stillwell merely re-attached the bumper cover over the damage so that it "was hidden" and "you couldn't see it" (*id.* at 55). The damage that went unrepaired affected the safety and structural soundness of the vehicle (Doc. 80 at 135–37). Stillwell did not inform his supervisors of his actions or attempt to correct the estimate before the PT Cruiser left the shop (Doc. 92 at 24–26). Unaware of the issue, Mathews Ford paid Stillwell as if he had performed all the work listed in the estimate (*id.* at 25–46).

The issue was eventually discovered after the vehicle was involved in another accident (Doc. 80 at 132). On February 7, 2011, Biggerman confronted Stillwell, and Stillwell confessed (*id.* at 139; *see also* Doc. 91 at 54–57). Biggerman issued a write-up placing Stillwell on strict probation, which Stillwell signed (Tr. Ex. 113). Spencer testified at trial that there "is a big difference" between strict and regular probation. "Strict probation . . . is something when you commit fraud. And probation is when you make a mistake" (Doc. 92 at 142). But at his deposition, Spencer testified that there "[p]robably isn't any" difference between regular and strict probation (Doc. 81 at 138). Regardless,

7

the write-up clearly states that Stillwell was on probation and that "[i]f this happens again he will be terminated immediately" (Tr. Ex. 113). And statements from Biggerman and Spencer reflect that they regarded this as a serious infraction. *See, e.g.*, Doc. 80 at 139 ("[W]e can't have that. That's fraud. That's insurance fraud, and it's a safety item."). This was Stillwell's first write-up, but it was not the first issue with his repair work (Doc. 80 at 147–49).

**Ford F-150 Incident**

A few months later, Stillwell was assigned to repair a Ford F-150 (*see* Doc. 91 at 58). The truck was at Mathews Ford as part of a Direct Repair Program (DRP) with State Farm. Stillwell understood that maintaining status in the DRP is very important, and that Mathews Ford could lose its status if a technician does a bad job, is careless, or is dishonest (Doc. 92 at 24).

The estimate from Biggerman stated that the right front door and rear cab door needed work. "[I]t was written down as an RI, remove and install" (Doc. 91 at 58). To do this, Stillwell had to remove the trim panel, the mirror, and the rain shield on both doors (*id.* at 58–59). Stillwell claims he told Biggerman that there was old damage on the trim panel and the mirror (*id.* at 59–60). "Old damage" refers to damage that is "unrelated to the reason that the car" is in the shop (*id.* at 62). If a technician discovers old damage, he is to flag it for the person who prepared the estimate. Unless that person tells the technician otherwise, he or she "do[esn]'t touch" old damage (*id.* at 61–62). According to Stillwell, Biggerman never told him to fix the old damage on the Ford F-150, so he didn't.

A few days later, the truck returned to Mathews Ford. Biggerman motioned for Stillwell to come to the truck, pointed to the rear cab door, and told him to redo his work (*id.* at 63). While working on the truck, Stillwell noticed the mirror was still loose and believed "someone had tried to fix it" (*id.* at 65). He claims he did not work on the front door during this visit.

8

Still unsatisfied with the repairs, in December 2011 the customers brought the truck to D&F Collision. Dan Dean (owner of D&F) inspected the truck when it arrived (Doc. 76-1 at 10–11). Based on his review, he concluded the body work previously performed was "substandard" and the technician cut corners (*id.* at 13–23). He could not, however, confirm who completed the previous work (*see id.* at 42–43). But he had no reason to believe that the customers attempted to repair the truck themselves, or that they brought it to another shop between picking it up from Mathews Ford and bringing it to D&F (*id.* at 12, 14–15, 45). A month or two later, Dean received a call from a manager at Mathews Ford, likely in response to a re-repair bill from State Farm (*see id.* at 46–48). Dean told the manager that he thought the previous work was "substandard" and "everything was broken" (*id.* at 47).

Around this same time, Biggerman and Stillwell met again about the Ford F-150. This time Jerry McGinnis (a painter) and an insurance representative were also present (Doc. 92 at 66–67). The insurance representative showed Stillwell a broken piece of trim panel (*id.* at 67). Stillwell "looked to Biggerman" and put his "arms in the air," attempting to communicate that Biggerman already knew about this (*id.* at 68). Biggerman and the insurance representative continued talking, and Stillwell returned to work. Stillwell did not attempt to discuss the issue further or otherwise confirm that Biggerman understood his gesture. When Biggerman was deposed over five years later, he did not recall writing the estimate for the truck, who was assigned to repair it, or any of these conversations (Doc. 80 at 149–54).

Holmes did not recall exactly when or how he became aware of the issues with the Ford F-150. But a few weeks after he started, he received a follow-up call from State Farm about the re-repair bill. He then made himself "totally aware" of any relevant and available documentation (Doc. 90 at 95–96, 99–101). At that point, he brought the issue to Spencer and Thurman's attention (*id.*).

9

The three of them did not specifically discuss who was responsible for the poor repairs, but at some point during the meeting, Spencer and Thurman pulled out Stillwell's previous write-up (*id.* at 102, 132–33). At trial, Spencer testified that "it was clear as day that [Stillwell] was responsible" for the poor work based on his review of the pictures provided by State Farm and his knowledge that Stillwell was the technician assigned to the truck (Doc. 92 at 124, 132–34). He admitted that he "did not physically inspect the [truck]" (*id. a*t 132).

During his deposition, Holmes opined that "typically" in situations like this, "when you're buying parts, it's going to fall on the body tech" because "the painter is typically not going to damage those parts" (Doc. 90 at 102–03). When asked if he had an "independent reason" to think that Stillwell had completed the poor repairs, Holmes stated "the proof is in the photos" (*id.* at 104–05). Although he could not identify *who* caused the damage from the photos, he could identify damage likely caused by the body technician (*id.* at 105–32; *see also* Doc. 80 at 173–94). The photos also revealed issues with the paint job. Mathews Ford, however, did not discipline the painter (Doc. 90 at 155).

The decision to terminate Stillwell was "[u]ltimately . . . Thurman's choice," but was discussed by Thurman, Spencer, and Holmes (Doc. 92 at 104–05). Spencer testified that Stillwell was terminated because of "his dishonesty" related to the PT Cruiser and the "completely botched repair" of the Ford F-150 (*id.* at 131). Stillwell was already on strict probation, and then he "cut corners and the whole [Ford F-150] job was a mess" (*id.* at 124–25). At that point, Mathews Ford "had lost complete confidence in Mr. Stillwell to repair [its] customer's vehicles . . . . [T]here's people making mistakes. But then there's dishonest people that when you can no longer trust them, you can't count on them to work for you anymore" (*id.* at 125).

10

Holmes believed the decision to terminate Stillwell was made primarily by Spencer and Thurman "due to the write-up from the previous poor repair" (Doc. 90 at 104; *see also id.* at 134–35). If it was up to him, Holmes was not sure he would have terminated Stillwell. But he felt the decision "just followed the directive" from the first write-up, which "Stillwell agreed to" (*id.* at 140–41).

Before his termination, Stillwell never complained about the work environment at Mathews Ford and generally believed he was treated fairly (Doc. 91 at 113; Doc. 92 at 8–12; *see also* Tr. Ex. 2). And during the EEOC investigation, Stillwell did not originally tell the EEOC that he believed he was terminated because of his disability (Doc. 92 at 60–61; *see also* Tr. Ex. 2).

**Stillwell's Replacement**

Stillwell was replaced by an employee without a disability -- Michael Wine (Doc. 90 at 160–62; Doc. 92 at 104). Wine and Holmes had previously worked together (Doc. 90. at 156–59). When Wine originally applied for a position with Mathews Ford, perhaps at Holmes' request, there were no body technician openings. He could not have been hired unless one of the technicians left (*see* Doc. 90 at 158–61). Less than two weeks after Wine applied, and just weeks after Holmes was hired, Stillwell was terminated (*see* Tr. Ex. 13). Holmes made the decision to hire Wine, with Thurman's approval (Doc. 92 at 103–04).

**Discipline of Other Employees**

Stillwell contends that Mathews Ford tolerated similar or more severe misconduct from several other employees, including Jermaine Flourney, Bill Ulrey, Shawn Dye, Cody Bash, Mike Ryan, and Biggerman.

Like Stillwell, Flourney was a body technician. In June 2010, Biggerman wrote him up for "sloppy" repairs, but did not place him on probation (Tr. Ex. 28). In April 2012, Holmes placed him

11

on probation for thirty days due to "poor quality" repairs (Tr. Ex. 29). A day later, he received a second write-up, but he was not terminated (Tr. Ex. 30). Unlike Stillwell's write-up, Flourney's original write-up did not state he would be "terminated immediately" for his next offense. He was eventually terminated after State Farm uncovered another poor repair (Doc. 90 at 73–74, 82).

Ulrey was also a body technician. In March 2012, Biggerman wrote him up for poor repairs (Tr. Ex. 33). The write-up stated that "[h]e w[ould] be terminated" if he "c[ouldn]'t get this under control" (*id.*). D&F also corrected a repair by Ulrey (Doc. 76-1 at 58–61). Although Dean "think[s]" this occurred after the re-repair of the Ford F-150 in December 2011, he could not remember the exact date (*id.* at 58). There is no evidence that Ulrey was terminated from Mathews Ford.

Dye and Bash were employees of Mathews Hyundai, a branch of Mathews Ford. Neither held the same position, or had the same supervisor, as Stillwell. Dye was written up multiple times due to work quality issues (Tr. Exs. 50–51), and he was eventually terminated in his third write-up (Tr. Ex. 52). Bash was not terminated or placed on probation for his first mistake (*see* Tr. Ex. 31). In his second write-up, he received a week off without pay (Tr. Ex. 32).

In November 2011, Biggerman and Mike Ryan were disciplined for taking inappropriate pictures of female customers. At the time, Ryan was assistant body shop manager (Doc. 92 at 98). A female customer discovered the issue after Biggerman showed her a photo they had taken of her bending over a car (*id.* at 148–49). Both Biggerman and Ryan were written-up for the incident, but neither write-up described the underlying incident or reflected that they were on probation (Tr. Exs. 14–15). Biggerman's write-up, however, did state that "this can never happen again, dealership will have zero tolerance" (Tr. Ex. 14). Spencer testified that Biggerman and Ryan "knew that if they did it again, they would no longer work for us" (Doc. 92 at 150). Spencer agreed this "was something they shouldn't have done," but believed it was different than Stillwell's conduct because Biggerman

12

and Ryan "never really lied about it or committed fraud" (*id.* at 149–50). Before this incident, Ryan was disciplined for accidentally starting a fire (Tr. Ex. 18). Nothing indicates that either Biggerman or Ryan had subsequent discipline issues.

### CONCLUSIONS OF LAW

**Mathew Auto Group**

As an initial matter, this Court agrees with Defendants that "Mathews Auto Group" is neither a legal entity with the capacity to be sued nor Stillwell's employer. Despite numerous opportunities to dismiss this Defendant voluntarily, EEOC refused to do. EEOC failed to submit evidence showing Mathews Auto Group is anything more than a mere trade name or brand name used to collectively advertise independent Mathews dealerships. Trade names are not legal entities. *See Rachells v. Cingular Wireless Emp. Servs, LLC*, 483 F. Supp. 2d 583, 587 (N.D. Ohio 2007) ("This Court lacks jurisdiction to entertain a suit against trade names.").

There is no evidence that Mathews Auto Group is (or ever was) registered to do business in Ohio. And there is no evidence that Mathews Auto Group ever paid taxes or paid a single employee. EEOC submitted a chart that reflects payments purportedly drafted by GEICO to the payee "Mathews Auto Group" (Tr. Ex. 57). But these checks were deposited into an account maintained solely by Mathews Ford (Doc. 93). Moreover, Stillwell worked only at Mathews Ford, was paid only by Mathews Ford, and was disciplined only by Mathews Ford personnel (Doc. 91 at 94–96; Tr. Exs. 2, 38, 42–46). Thus, Mathews Ford, and Mathews Ford only, was Stillwell's employer. Mathews Auto Group is dismissed.

**Failure to Accommodate Claim**

The ADA prohibits an employer from "discriminat[ing] against a qualified individual on the basis of [a] disability," which includes "not making reasonable accommodations" for a disabled

employee. 42 U.S.C. § 12112(a), (b)(5)(A). An employer's obligation to accommodate includes providing such "[m]odifications or adjustments" that would allow the disabled person to "perform the essential functions" of the job or "enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities." 29 C.F.R. § 1630.2(o).

To prevail on the failure to accommodate claim, EEOC must show (1) Stillwell was disabled within the meaning of the ADA; (2) he was otherwise qualified for his position; (3) Mathews Ford knew or had reason to know about his disability; (4) he requested an accommodation; and (5) Mathews Ford failed to provide a reasonable accommodation thereafter. *Green v. BakeMark USA, LLC*, 683 F. App'x 486, 491 (6th Cir. 2017). Mathews Ford does not dispute that the first three elements are satisfied.

The employee carries the "initial burden" of requesting an accommodation. *Id.* at 493. An employer "is not required to speculate as to the extent of the employee's need or desire for an accommodation." *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046–47 (6th Cir. 1998). Once a request is made, the employer must engage in a good-faith "interactive process" with the employee to determine the appropriate accommodation. *Rorrer v. City of Stow*, 743 F.3d 1025, 1040 (6th Cir. 2014). If the process fails, "responsibility will lie with the party that caused the breakdown." *Id.* "[I]f the employee never requests an accommodation, the employer's duty to engage in the interactive process is never triggered." *Melange v. City of Center Line*, 482 F. App'x 81, 85 (6th Cir. 2012).

As discussed above, Mathews Ford provided Stillwell with every accommodation he requested before April 16, 2012 -- an interpreter for a training event, an interpreter for a staff meeting, and space to install a VRS system (Doc. 91 at 34–37, 43–46, 96–97). EEOC failed to show Stillwell requested an interpreter for future company meetings (*see id.* at 100–01). Based on these limited

14

requests and Stillwell's previous ability to communicate in one-on-one and small group settings, Mathews Ford had no reason to believe Stillwell needed an interpreter at the April 16, 2012 termination meeting. Thus, the reasonable accommodation claim rises and falls on the effect of his request at that meeting.

This Court finds Stillwell did not request an interpreter on April 16, 2012 until after he read *and understood* he was terminated (*see id.* at 72–74; Doc. 92 at 34). Thus, the request was made after Mathews Ford's employment relationship with Stillwell had ended and, with it, Mathews Ford's duty to accommodate. Even if the request was part of Stillwell's employment, it was not necessary to any job function, or even to communicate his side of the story. *See Novella v. Wal-Mart Stores, Inc.*, 226 F. App'x 901, 903 (11th Cir. 2007). As his own efforts reveal, Stillwell had both the ability and several opportunities to share his version of events with Mathews Ford after the meeting. He simply declined to do so (*see* Doc. 91 at 81; Doc. 92 at 18–21). Further, according to both Holmes and Spencer, his explanation would not have changed the outcome -- Holmes did not have the authority to negotiate, and the termination decision was final (*see* Doc. 90 at 104, 134–35; Doc. 92 at 127–28, 133–35). *See also Thomas v. Avis Rent a Car*, 408 F. App'x 145, 153 (10th Cir. 2011). The reasonable accommodation claim fails.

**Wrongful Termination**

EEOC also claims Stillwell was wrongfully discharged because of his disability. Disability discrimination claims based on indirect evidence, such as this one, are analyzed under the *McDonnell Douglas* burden-shifting framework. *Williams v. AT &T Mobility Servs.*, 847 F.3d 384, 395 (6th Cir. 2017). To establish a prima facie case, EEOC must show (1) Stillwell was disabled; (2) he was otherwise qualified to perform the essential functions of his position, with or without reasonable accommodation; (3) he suffered an adverse employment action; (4) Mathews Ford knew or had

15

reason to know about his disability; and (5) the position remained open or he was replaced by a non-disabled person. *Id.* If EEOC makes out a prima facie case, the burden shifts to Mathews Ford to articulate a legitimate, nondiscriminatory reason for the termination. *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011). EEOC must then show by a preponderance of the evidence that the reason given by Mathews Ford is pretextual, "designed to mask unlawful discrimination." *Williams*, 847 F.3d at 395.

Mathews Ford does not dispute that EEOC has established a prima facie case. And while there may be disagreement about whether the problems with the Ford F-150 were Stillwell's fault, Mathews Ford has sufficiently demonstrated a legitimate and nondiscriminatory reason to terminate Stillwell -- poor performance after he was already on probation for dishonest conduct. The burden therefore shifts back to EEOC to show the proffered reason is pretext for discrimination. *See Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012). Although Stillwell's disability need not be the sole reason he was terminated, it must be a "but for" cause. *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 318 (6th Cir. 2012) (en banc).

EEOC may demonstrate pretext by showing the proffered reason (1) has no basis in fact, (2) did not actually motivate the decision, or (3) was insufficient to warrant termination. *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 895 (6th Cir. 2016). EEOC argues the proffered reason is pretextual because Stillwell was not responsible for the poor repairs to the Ford F-150, and Mathews Ford tolerated similar, or more serious, misconduct from other employees. Mathews Ford responds that it honestly and reasonably believed Stillwell was responsible for the shoddy work on the Ford-F150, and that the other employees were not on strict probation for intentional and deceptive behavior.

*Honest Belief Rule*

The honest belief rule provides that "as long as the employer honestly believed the reason it gave for its employment action, an employee is not able to establish pretext even if the employer's reason is ultimately found to be mistaken." *Id.* After all, "[t]he focus of a discrimination suit is on the intent of the employer." *Id.* (citation omitted). "[I]f the employer honestly, albeit mistakenly, believes in the non-discriminatory reason it relied upon in making its employment decision, then the employer arguably lacks the necessary discriminatory intent." *Id.* at 895–96 (citation omitted). To prove a belief is honestly held, "the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Id.* at 896 (citation omitted). And once the employer shows it made a "reasonably informed" decision, "the employee has the opportunity to produce proof to the contrary." *Id.* at 896 (citation omitted).

Mathews Ford submitted sufficient evidence to show that it honestly believed Stillwell was responsible, at least in part, for the poor repairs to the Ford F-150 and that this was grounds for termination based on his previous write-up. At the time of the decision, Thurman, Spencer, and Holmes had access to D&F's estimate for the re-repairs, including body repairs; knowledge that Stillwell was the body technician assigned to the Ford F-150; photos showing issues ordinarily attributable to the body technician; and Stillwell's previous signed write-up (Doc. 90 at 99–132; Doc. 92 at 124, 132–34). Although Mathews Ford could have completed a more thorough investigation, the honest belief rule "do[es] not require that the decisional process used by the employer be optimal or that it left no stone unturned." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998).

EEOC has not submitted evidence rebutting that Mathews Ford *believed* Stillwell was responsible for the poor work at the time he was terminated. In fact, with the exception of Stillwell's testimony, all evidence suggests that Stillwell was at least partially responsible. This Court has

17

already addressed some of the credibility issues with Stillwell's testimony, and others are accurately reflected in Mathews Ford's post-trial brief (Doc. 96 at 2–4).

### *Similarly Situated Employees*

EEOC also attempts to show Stillwell's poor repairs were insufficient to, or did not actually, motivate his termination because Mathews Ford did not terminate other employees who engaged in similar, or more severe, misconduct. But to draw a comparison with other, non-disabled employees, EEOC must show that Stillwell and the other employee are "similar in all of the *relevant* aspects." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (emphasis in original) (citation omitted). Relevant aspects include whether the employees had the same supervisor, had to meet the same standards, and engaged in acts of comparable seriousness. *See id.* Employees are not similarly situated if there are "differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* (citation omitted).

EEOC has failed to identify a similarly situated, non-disabled employee that Mathews Ford treated more favorably than Stillwell. Dye and Bash both worked at a different location, for a different supervisor, and in a different position. Flourney did not knowingly cover up, and charge for, incomplete repairs. EEOC failed to show that like Stillwell, Ulrey engaged in further misconduct after his write-up stating he would be terminated if his poor repairs continued, or that the write-up was prompted by intentional misconduct. And although there can be no doubt that Ryan and Biggerman's November 2011 misconduct was serious and showed a lack of integrity, there were differentiating and mitigating circumstances. For example, it seems this was Biggerman's first write-up, and Ryan's only previous write-up was for an accident. And like Ulrey, EEOC has not shown that they engaged in any subsequent misconduct.

18

*Discriminatory Nexus*

Finally, even if one were to find Mathews Ford's proffered reason suspect, EEOC has failed to show Stillwell's disability was the actual reason he was terminated. EEOC suggests Holmes was motivated to get rid of Stillwell to create an opening for Wine, with whom he had a prior working relationship. But playing favorites is not a basis for an ADA claim. Even assuming this were true, the only nexus connecting Stillwell's termination and his disability is a comment from Holmes during his deposition that he "was a little worried about how to communicate" with Stillwell when he first found out he was deaf (Doc. 90 at 159), and the fact Stillwell was discharged only a few weeks after Holmes was hired. But Holmes also testified that he did not recall ever finding it frustrating to talk or explain something to Stillwell, and that he was not sure he would have terminated Stillwell if the decision was his alone (*id.* at 89, 140). Further, "temporal proximity cannot be the sole basis for finding pretext." *Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012).

Considering the totality of the circumstances, including Stillwell's own statements about his treatment at Mathews Ford throughout his employment, this Court finds EEOC failed to show Stillwell's disability was the "but for" cause of his termination. The wrongful discharge claim therefore fails.

## CONCLUSION

Could Mathews Ford have had a better policy in place? Of course. And could Mathews Ford have terminated Stillwell in a "nicer" way? Certainly. But that is not enough for EEOC to succeed on its claims. EEOC has failed to prove its case by a preponderance of the evidence.

One final comment. EEOC took a number of years to move this case through the administrative process and into the court. Numerous lawyers handled the claim at both the administrative and court level. This delay undoubtedly contributed to the imprecise (and at times

inaccurate) timeline of events as well as the inability of several witnesses to recall details of key events, including the Charging Party. This Court could also comment on the legal handling of this case by both sides, but that would require many more pages and is already documented elsewhere in the record.

For all of the foregoing reasons, this Court dismisses Defendant Mathews Auto Group and rules in favor of Defendant Mathews Ford on all counts.

IT IS SO ORDERED.

s/ *Jack Zouhary*  
JACK ZOUHARY  
U. S. DISTRICT JUDGE

June 29, 2018